165 F.3d 1062
 UNITED STATES of America, Plaintiff-Appellee,
v.
Mashaun HARRIS, Defendant-Appellant (97-6283).
United States of America, Plaintiff-Appellee/Cross-Appellant (97-6437),
v.
Andre P. Virges, Defendant-Appellant (97-6284)/Cross-Appellee.
 Nos. 97-6283, 97-6437 and 97-6284.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 8, 1998.
Decided Jan. 26, 1999.
 
 Tony R. Arvin, Asst. U.S. Attorney (argued and briefed), Office of U.S. Attorney, Memphis, TN, for United States of America.
 R. Linley Richter, Jr. (argued and briefed), Richter Law Office, Memphis, TN, Mashaun Harris (briefed), pro se, U.S. Penitentiary, Beaumont, TX, for Mashaun Harris.
 Karen R. Cicala (argued and briefed), The Hardison Law Firm, Memphis, TN, Andre P. Virges (briefed), pro se, Northwest Correction Center, Tiptonville, TN, for Andre P. Virges.
 Before: NELSON and DAUGHTREY, Circuit Judges; SARGUS, District Judge.*
 OPINION
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 The defendants, Mashaun Harris and Andre Virges, stand convicted of bank robbery, a crime under 18 U.S.C. § 2113. Through counsel, Mr. Harris has appealed his conviction on two grounds: (1) that the district court erred in declining to declare a mistrial after a government witness let the jury know that Harris had been arrested before, and (2) that the court erred in failing to rule on certain discovery motions. Mr. Virges, through counsel, has appealed his conviction on the ground that the court committed reversible error in overruling an objection interposed after his former girlfriend testified that she was afraid of him.
 
 
 2
 Both men have filed virtually identical pro se briefs arguing that the government failed to show that the deposits of the bank in question were insured by the Federal Deposit Insurance Corporation. See 18 U.S.C. § 2113(f). The pro se briefs also challenge sentence enhancements imposed under U.S.S.G. § 3B1.4, a section of the sentencing guidelines that prescribes an offense level increase where, among other things, a person less than 18 years of age is used to assist in avoiding apprehension for the offense.
 
 
 3
 The government has taken a cross-appeal from the sentence given Mr. Virges. The cross-appeal turns on the question whether a state court conviction for the crime of escape from a jail or workhouse should have been treated as a conviction for a "crime of violence" under the career offender sections of the sentencing guidelines, U.S.S.G. §§ 4B1.1 and 4B1.2.
 
 
 4
 Finding the defendants' assignments of error unpersuasive, we shall affirm the convictions and the sentence imposed on Mr. Harris. We agree with the government that escape should be treated as a crime of violence--an issue not heretofore settled in this circuit--and we shall therefore remand the Virges case for resentencing. In doing so, however, we note that on remand the district court will have an opportunity to consider whether it would be appropriate to depart downward from the sentence range prescribed by the guidelines.
 
 
 5
 * On March 12, 1996, at approximately 9:20 a.m., two masked men robbed a branch of the Union Planters Bank in Memphis, Tennessee. The robbers, who were unarmed, carried off $14,677.40 in a black gym bag.
 
 
 6
 Because the robbers wore stocking masks, no one in the bank could see their faces. Identification of the perpetrators was facilitated, however, by the fact that the bundles of cash to which they helped themselves included two dye packs that exploded soon after the robbery.
 
 
 7
 In presenting its case to the jury, the government linked the defendants to the dye packs through the testimony of Courtney Williams and Kimberlee Kubacki. Ms. Williams was the girlfriend of defendant Mashaun Harris. Ms. Kubacki--a 17-year-old juvenile at the time of the crime--was the girlfriend of Mashaun's older brother, 28-year-old Andre Virges.
 
 
 8
 Testifying under a grant of immunity, Ms. Williams told the jury that she had not known about the bank robbery in advance; that Mashaun Harris had wanted to borrow her car, a red Mitsubishi, on the morning in question; that because of his tendency to "stay[ ] gone all the time" when he had the car to himself, she volunteered to take him where he wanted to go; that he instructed her to drive him first to the house where his brother was staying with Kim Kubacki and then, after Ms. Kubacki and Mr. Harris had joined them, to the neighborhood where the bank was located; that the men got out of the car at a spot close to the bank and told the girls to wait for them at a nearby parking lot; that the defendants soon returned to the car, got in the back seat, and--with a cloud of red smoke filling the vehicle--told Ms. Williams to "[d]rive this [expletive deleted] car, a bank been robbed."[1]
 
 
 9
 Ms. Kubacki gave a similar account of the morning's events. She testified that her then-boyfriend, Andre Virges, had awakened her on the morning of March 12, 1996, and told her to get dressed because Courtney and Mashaun were coming over; that the four of them drove to the vicinity of the bank in Ms. Williams' red Mitsubishi; that the brothers were dropped off after telling the girls to wait for them in the parking lot; that on their return, Andre Virges was wearing a pantyhose mask and Mashaun Harris was carrying a bag which, when it was placed in the back seat, became the source of an impressive emission of red smoke; and that the defendants' first words, after they got back in the car, were "We just robbed a bank, pull off."[2]
 
 
 10
 Testimony adduced from one or another of the government's witnesses indicated that on leaving the parking lot after the robbery the foursome drove to the home of a cousin of the defendants; that there the defendants attempted to launder the dye-stained currency, soaking it in pots containing "dye remover" and then running it through a laundry dryer; that the young women cleaned up the car (the carpeting of which had a red stain they could not get rid of) and used air freshener to try to mask the smell left by the dye packs; that the four then went to Chicago for a few days, where the defendants had the car painted green in the hope of avoiding detection by the police when they returned to Memphis; that one of the defendants was arrested in the freshly verdant Mitsubishi on April 8, 1996, by which time the stained area of the carpeting had been cut out and disposed of; and that under a mattress at the home of the defendants' mother the police found currency on which, although the money appeared to have been bleached, red dye was still visible. All in all, it is fair to say, the evidence of the defendants' guilt was very strong indeed.
 
 
 11
 After the jury returned its verdicts of guilty, presentence investigation reports were prepared for the district court by a probation officer. All parties received copies of the reports. Neither defendant filed any objections, but the Assistant U.S. Attorney handling the matter for the government objected to the probation officer's failure to recommend that Mr. Virges be sentenced as a career offender. Overruling this objection, the district court sentenced Mr. Virges to imprisonment for a term of 137 months. Mr. Harris received a term of 105 months. Each defendant appealed, and the United States cross-appealed as to the sentence given Mr. Virges.
 
 II
 
 12
 * Mr. Harris argues on appeal that he was entitled to a mistrial because of the following testimony by police officer Robert Shemwell:
 
 
 13
 "Q: Officer Shemwell, did you arrest Mashaun Harris on April 8th of 1996?
 
 
 14
 A: Yes, I did.
 
 
 15
 Q: I want to ask you about that arrest. Did you go to a certain location looking for Mashaun Harris and try to find him and arrest him?
 
 
 16
 A: Yes, we did.
 
 
 17
 Q: Where did you go looking for him?
 
 
 18
 A: To his last known address given on the last arrest at 1863 Baldwin."
 
 
 19
 Defense counsel objected to the answer to the last question, whereupon the district court sua sponte instructed the jury as follows: "Ladies and gentlemen, disregard any statement by the Sergeant about any arrest record of any kind." Out of the jury's presence, defense counsel then moved for a mistrial. The motion was denied.
 
 
 20
 Relying primarily on United States v. Blanton, 520 F.2d 907 (6th Cir.1975), Mr. Harris contends that the district court abused its discretion in refusing to declare a mistrial. The contention is unpersuasive.
 
 
 21
 In Blanton, where the defendant was tried on charges of illegal possession of firearms, two of the government's witnesses testified that the defendant was a bank robbery suspect. One of the witnesses, in his eagerness to re-emphasize the objectionable evidence, overrode an explicit ruling by the trial judge. Id. at 910. Given this egregious misconduct, we held that the defendant was entitled to a new trial.
 
 
 22
 In United States v. Hernandez, 873 F.2d 925, 927-28 (6th Cir.1989), a subsequent case involving improper testimony by a government witness, it was held that Blanton did not require a new trial under circumstances described by this court as follows:
 
 
 23
 "The government's line of inquiry was reasonable and justified by the [circumstances of the witness being questioned]. Moreover, there is no showing that the government acted in bad faith or otherwise 'deliberately injected' [the witness'] stray remarks. The remarks themselves constituted a small portion of the evidence brought against [the defendant]. Finally, the district court acknowledged [the defendant]'s objections and immediately admonished the jury in clear and forceful language." Id. at 928.
 
 
 24
 In the case at bar, similarly, it does not appear that the government intentionally elicited the reference to defendant Harris' prior arrest; the government's line of questioning was reasonable; the district court gave an immediate and clear limiting instruction; the isolated allusion to the prior arrest was not part of a pattern indicative of bad faith; and the officer's stray remark constituted only a minuscule part of the evidence against Mr. Harris. Under these circumstances, it is clear, the district court did not abuse its discretion in declining to grant a mistrial. See, in addition to Hernandez, our more recent decision in United States v. Forrest, 17 F.3d 916, 920 (6th Cir.), cert. denied, 511 U.S. 1113, 114 S.Ct. 2115, 128 L.Ed.2d 673 (1994), and the cases there cited.
 
 B
 
 25
 Mr. Harris further contends that the district court committed reversible error in failing to rule on various pretrial discovery motions. The government responds that Mr. Harris failed to preserve this issue for appellate review, not having raised the matter at trial or "at either of the two (2) pretrial report dates." We agree with the government. "[S]ince appellant did not request a ruling on his motion for discovery at the final pretrial conference, we regard him as having abandoned it." Steinberg v. Ogden Foods, Inc., 501 F.2d 1339, 1341 (6th Cir.1974).
 
 C
 
 26
 The sole assignment of error presented by counsel for Mr. Virges involves the following testimony by Ms. Kubacki:
 
 
 27
 "Q. Did you know, what did Andre Vergis [sic] say about Mashaun and Courtney coming over?
 
 
 28
 A. Nothing.
 
 
 29
 Q. Did he say why they were coming over?
 
 
 30
 A. No, sir, and I didn't ask.
 
 
 31
 Q. Why didn't you ask?
 
 
 32
 A. I was scared to ask. I was at the point that I was afraid of Andre.
 
 
 33
 Q. Okay.
 
 
 34
 A. I didn't want to be by myself with him at all, and he knew that."
 
 
 35
 Defense counsel objected, citing "relevance," and the district court overruled the objection. Mr. Virges argues on appeal that the testimony somehow constituted evidence of "other crimes, wrongs or bad acts." As such, he contends, the evidence should have been stricken under Rule 404(b), Fed.R.Evid.
 
 
 36
 The argument has no merit. There was no direct evidence of other crimes or bad acts, and the testimony provided relevant background information. Given the overwhelming evidence of Virges' guilt, moreover, any error would have been harmless.
 
 D
 
 37
 In their supplemental pro se briefs Harris and Virges both contend that the government failed to "prove that the bank in question was insured by FDIC on the day of the robbery." This issue has not been preserved for appellate review, and the contention is without merit in any event.
 
 
 38
 Mr. Neighbours, a fraud investigator and banking officer at Union Planters Bank, testified that the bank was insured by the Federal Deposit Insurance Corporation at the time of the offense. (He also displayed to the jury a certificate of insurance effective at the time of trial.) Nothing more was required. See United States v. Wood, 780 F.2d 555, 556-57 (6th Cir.), cert. denied, 475 U.S. 1111, 106 S.Ct. 1522, 89 L.Ed.2d 920 (1986).
 
 
 39
 The defendants also contend that the district court erred in increasing their guideline offense levels under U.S.S.G. § 3B1.4, a section that prescribes a two-level enhancement where "the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense...." Although Kimberlee Kubacki was under 18, the defendants argue that
 
 
 40
 "Ms. Kubacki stated that she was not intimidated, coerced, counseled, or encouraged to commit a crime, moreover, Ms. Kubacki stated ... that she had no knowledge of what [Harris' or Virges'] intentions were on the day of the robbery. She further stated that she had no knowledge of the robbery until [Harris and Virges] returned to the car."
 
 
 41
 The defendants appear to misunderstand the reason for the enhancement. The presentence reports recommended enhancement under § 3B1.4 not on the ground that Ms. Kubacki was used to commit the robbery, but on the ground that she "assisted ... in bleaching and ... removing the red stains from the stolen money." The defendants offered no objection to the court's acceptance of the probation officer's recommendation, thereby waiving any challenge they might otherwise have had. We note, moreover, that the enhancement could have been justified in any event because of Ms. Kubacki's assistance in cleaning up the getaway vehicle.
 
 III
 
 42
 We turn finally to the government's cross-appeal. The sentencing guidelines, as the government points out, provide for enhancement of a defendant's guideline offense level in accordance with a prescribed table if the defendant is a "career offender" as defined in U.S.S.G. § 4B1.1. The definition of a career offender has three elements: the defendant must have been at least 18 years old when he committed the offense for which he is to be sentenced, that offense must have been a felony constituting either a "crime of violence" or a "controlled substance offense," and the defendant must have had at least two prior felony convictions falling in one or the other of those categories. The government contends that the district court erred in not sentencing Mr. Virges as a career offender.
 
 
 43
 It is undisputed that Mr. Virges satisfied the first two elements of the career offender definition: he was over 18 years of age when he robbed the bank, and the robbery qualified as a crime of violence under U.S.S.G. § 4B1.2(1). It is also undisputed that Mr. Virges had at least one prior felony conviction for a crime of violence--a Memphis Criminal Court conviction for the robbery of a woman whose purse he snatched in 1987. There is a dispute, however, as to whether another of Mr. Virges' prior felony convictions--this one a 1988 Memphis Criminal Court conviction for the crime of escape from a jail or workhouse--likewise qualified, under the guidelines, as a crime of violence.
 
 
 44
 A prior felony conviction qualifies if the crime meets any of the following three criteria: it is one of the crimes specifically enumerated in § 4B1.2, or it "has as an element the use, attempted use, or threatened use of physical force against the person of another" ( § 4B1.2(1)(i)), or it "is burglary of a dwelling ... or otherwise involves conduct that presents a serious potential risk of physical injury to another" ( § 4B1.2(1)(ii)). See United States v. Payne, 163 F.3d 371, 373 (6th Cir.1998).
 
 
 45
 Mr. Virges' 1988 conviction was for violating former Tenn.Code Ann. § 39-5-706. That statute made it a felony for "any person confined in a county workhouse or jail or city jail or municipal detention facility upon any charge of or conviction of a criminal offense constituting a felony [to] escape or attempt to escape therefrom...."
 
 
 46
 The § 39-5-706 offense did not qualify as a crime of violence under either of the first two criteria set forth above: the offense was not one of the crimes specifically enumerated in U.S.S.G. § 4B1.2, and it did not have as an element the use or attempted or threatened use of physical force. The question, then, comes down to this: Did the escape offense "otherwise involve[ ] conduct that present[ed] a serious potential risk of physical injury to another" within the meaning of U.S.S.G. § 4B1.2(1)(ii)?
 
 
 47
 In answering this question, our caselaw teaches, the district court was not free to conduct a "broad factual inquiry" into what Mr. Virges actually did in the course of his escape. See United States v. Arnold, 58 F.3d 1117, 1121 (6th Cir.1995), (extending the rule of Taylor v. United States, 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), to the sentencing guidelines); Payne, 163 F.3d at 374 (same). This is true notwithstanding that Application Note 2 in the Commentary accompanying § 4B1.2 says that "[u]nder this section, the conduct of which the defendant was convicted is the focus of inquiry." (Emphasis supplied.) The approach to be followed by a sentencing court, rather, is "categorical" in nature; it requires the court to base its determination on the statutory definition of the crime. See Payne, 163 F.3d at 374. The court may review the indictment to see what specific conduct was charged, however, id. n. 2, and any relevant plea agreement may be examined as well. See Arnold, 58 F.3d at 1124. We presume, moreover, that there might be cases in which some other type of limited factual inquiry would be appropriate.
 
 
 48
 The indictment in question here did not go much beyond the statute. It charged that Mr. Virges "did unlawfully and feloniously while lawfully confined in the Shelby County Correctional Center, which is the workhouse for Shelby County, Tennessee, having been previously convicted on March 22, 1988, ... escape therefrom...." The circumstances of the escape were not disclosed in the indictment. If a plea agreement existed, it has not been brought to our attention.
 
 
 49
 At least two of our sister circuits have concluded that the crime of escape, by its nature, presents a serious potential risk of physical injury and thus constitutes a crime of violence under § 4B1.2(1)(ii). See United States v. Mitchell, 113 F.3d 1528, 1533 (10th Cir.1997), cert. denied, --- U.S. ----, 118 S.Ct. 726, 139 L.Ed.2d 665 (1998); United States v. Gosling, 39 F.3d 1140, 1142 (10th Cir.1994); United States v. Dickerson, 77 F.3d 774, 776-77 (4th Cir.), cert. denied, 519 U.S. 843, 117 S.Ct. 126, 136 L.Ed.2d 76 (1996).
 
 
 50
 Typical of the rationale employed in these cases is the following passage from the Tenth Circuit's Gosling opinion:
 
 
 51
 "[E]very escape scenario is a powder keg, which may or may not explode into violence and result in physical injury to someone at any given time, but which always has the serious potential to do so. * * * A defendant who escapes from a jail is likely to possess a variety of supercharged emotions, and in evading those trying to recapture him, may feel threatened by police officers, ordinary citizens, or even fellow escapees. Consequently, violence could erupt at any time. Indeed, even in a case where a defendant escapes from a jail by stealth and injures no one in the process, there is still a serious potential risk that injury will result when officers find the defendant and attempt to place him in custody." 39 F.3d at 1142.
 
 
 52
 We agree with the reasoning employed in these cases. Accordingly, and because we find nothing in the holding of Arnold that precludes us from adopting this reasoning, we shall vacate Mr. Virges' sentence and remand his case for resentencing. We intimate no view as to what sentence would be appropriate for Mr. Virges, and we do not exclude the possibility that a limited inquiry into his actual conduct at the time of his escape from the Shelby County Correctional Center, coupled with other relevant facts, might appropriately lead the sentencing court to conclude that a downward departure is warranted here.
 
 
 53
 The convictions of Mr. Harris and Mr. Virges are AFFIRMED, as is Mr. Harris' sentence. Mr. Virges' sentence is VACATED, and his case is REMANDED for further proceedings not inconsistent with this opinion.
 
 
 
 *
 The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of Ohio, sitting by designation
 
 
 [1]
 Although Mashaun Harris did not take the stand, his lawyer argued to the jury that Ms. Williams' use of the passive voice was significant; someone else might have robbed the bank, the lawyer suggested, dropping the loot when the dye pack exploded, and Harris and Virges might have picked up the bag of money after the robbers dropped it. The jury does not seem to have found this hypothesis likely
 
 
 [2]
 Ms. Kubacki's use of the active voice may not have gone unnoticed by the jury